Good morning, Your Honors. B. E. Bergeson for the appellant. May it please the Court. Although this case has a lot of issues in it, I'd like to limit my argument this morning to just three key points. The first is this Court's decision in the Termini case, which appellant contends cannot be meaningfully distinguished from our case in any meaningful way. The second is that the key distinction of Termini ---- Sorry. The key distinction ---- Sorry, I'm not standing. No, it wasn't your fault. It's close enough. The key distinction that the district court made in Termini was that in that case and the other Ninth Circuit cases, there had been a hidden peril, but there was no hidden peril in this case. Well, let me ask you about that, because that to me is the biggest problem with this case. I mean, the magistrate judge who heard and saw and felt the case said that there was insufficient evidence that the peril was hidden. So I assume that your argument has to be that that was clearly erroneous. It certainly is, Your Honor. And one of my ---- my second point was to, and I can be happy to take it first, is to detail for the Court, as we do in our brief, I'm going to try not to repeat my brief, but to highlight for the Court those undisputed factual matters which show, we would say, beyond any cavil that it had to be. Okay. A hidden peril. The key part, of course, would be your expert's testimony. I'm sorry, Your Honor? The key part would be your expert's testimony, I assume. Well, that's certainly part of it, because he did testify not only that this was a hidden condition, but that the approach itself was part of the hidden peril. But there's a ton of other evidence, Your Honor, from which we could conclude that the only logical conclusion, and Termini is really indistinguishable here, because the main fact in Termini was that the driver didn't see the cliff until it was almost, not quite, but almost too late to stop. And the problem I have is factual in that regard. I mean, clearly, if you have a road coming to an end of a sheer drop-off like that, that's one circumstance. But here we have a winding road with essentially, I think it's unpaved, isn't it? It's just a dirt road out in the boonie docks there. Having done my basic training at Hutter Liggett, I'm trying to so long ago, I'm trying to remember how approximate that would equate to what the conditions are, but you sure know when you're out in an area like that, driving a windy, hilly, dirt road, that you have to watch out for lots of things. And this is an erosion of a road that probably has lots of areas of erosion to some degree or another. So I'm having trouble putting this in the category of a Termini case factually. Yes. Well, in the Termini case, factually, Your Honor, the — and one of the arguments that BLM makes here is that in the Termini case, it was coming — the road was coming to a cliff. And we had no cliff drop-off here, if that was Your Honor's point. Well, that's not just my point. Obviously, there are differences. No, it's the nature of the condition that's being used. It's a road where you drive and you're in — this wouldn't be the only part on the road, I assume, where he's coming around a turn or going over a hill or whatever else. It's just the nature of the facility that he's using. No, Your Honor, for two reasons. First of all, as he's coming around the final corner, the testimony is undisputed that almost the right half of the roadway, which had been hard-packed, smooth travel portion of the roadway, becomes suddenly an eroded portion of the roadway. And so he's going now over very rough terrain, suddenly, at night, unexpectedly. And then he's pointed, as with the cliff, in the direction of a gaping, washout ditch. Yes, and then I read the expert testimony, and it seems that your expert's saying it is inevitable that anyone coming over that hill at 25 miles an hour is going to be in trouble. And yet — and now we get into the issue of no prior accidents. Assuming that they aren't conclusive, but that they are probative to some extent, how do we factor in, if at all, that this condition that you've described has been there for quite a while, that presumably a fair number of people have used that road, and yet your expert would suggest that the likelihood of an accident of the kind your client suffered would have happened previously? Well, the expert's testimony, I think, was largely — he said that it was a hidden danger. It was also the — his testimony was mainly the usual perception, reaction, time data. And he said that with this, when he could first see it, when his first headlights first went down that way, it would be too late if you put on your brakes to stop. But why couldn't the magistrate conclude that if that's so, there would have been a bazillion accidents? Oh, but that goes directly to the question of what is the significance of no prior accidents? Well, at the very least, at the very least, the significance is that that can't be right. Because if you couldn't see it, at least somebody else going along that road would have done the same thing. If you — if it's absolutely true that you couldn't see it, and if you were driving otherwise, you know, sensibly, coming over there, you couldn't see it, you would have done the same thing. Now, that's a permissible inference, isn't it? But, Your Honor, it would be a permissible inference. But the point is that in Termini, there had been no prior accidents, and the government argued that, and the Court said that is not a reason to say that a danger, an injury at this point, is not probable rather than possible. Do we have any indication of how many people traveled that road before this accident and how many at night? No, Your Honor. I don't think the record has a — it may have a count of how many go over that road, but if it does, it's nothing I picked up from the record. Well, just from my observation, it seems to me that that would be relevant as to whether or not there had been prior accidents. If that many people had gone over there at night, it would seem like it's not that significant a factor. Well, but again, Your Honor, this is Termini. And that was the argument that this Court rejected. And I believe in the Ross case, too, you'll find that there were a number of years that went by without any accidents, and the Court didn't even make any mention of that. Well, it's mentioned frequently in a lot of cases. It may well be that it's not dispositive, for sure. It's not dispositive. But the fact that there have — if there had been prior accidents, you would surely have used it. I mean, the absence of them has also got some probative value in the total mix of things. Well, of course, they would have been used. But the point is, with all respect, Your Honor, the holding of Termini, and there's no case that I know of in which this Court has ever said, because this Court, because there is no prior similar accident, we find that that is supportive. We find that that is supportive. Kagan, come on. Let's hear both Judge Fischer and I. Don't take what we're saying as being our point of view. But the point is, both of us have been very careful to say that the prior accident issue is not dispositive. So you're absolutely correct. There is no prior authority saying that the absence of prior accidents is the end of the ballgame. What I was suggesting was that, given the expert's assertion that this thing, you couldn't see it, and it's just totally hidden, I'm just suggesting that the fact that other people didn't encounter the same problem has some tendency to call his opinion into question, because otherwise there would have been exactly the same problem. Well, Your Honor, certainly this can be a relevant factor, but I don't believe Mr. Weber was that clear-cut about this accident was inevitable. Our position here is that the whole totality of factual circumstances, that when you come up and around that corner at night and point down and suddenly half of the road becomes eroded and suddenly there's a gaping ditch right off, which you have no perception reaction time to avoid, in a case where in both, by the way, neither the passenger and apparently Mr. Neva saw this ditch before they hit it, and why wouldn't this be, whatever else may be true, and I realize it's your job to ask the questions, not mine, but as a rhetorical question, why wouldn't this be a hidden peril at night under all of these circumstances? What, apart from the fact that an accident happened, hadn't happened there before, what circumstance did BLM put in, and no evidence that I'm aware of? Well, let me ask you this. What in your view is the effect, if any, of the track marks? And how does that factor in? Because the track marks, I mean, there's an argument, it seems to me, that the track marks are relevant only on liability down the road. Pardon me. I didn't mean a pun there. It came out that way. But the track marks certainly don't show a path that normally would be taken. The track marks are capable, as the magistrate judge noted, look as if he was going there no matter what. Well, if you read the – when one reads the opinion carefully, the judge was using the track mark only in the one sentence he mentions it to conclude that this accident was not probable rather than merely possible, and the Degger testimony in finding of fact 26 at page 37 of 27 of the records goes to the same fact. So, in fact, the judge wasn't deciding, if Your Honor is suggesting, a proximate cause. No, no, no. I'm not suggesting it at all. But from the point of view of the folks who are – who have got to make the judgment call about probable versus possible, isn't it reasonable for them to factor in that if you drive the road normally, an accident is not probable? If you drive the road so that you're heading toward the ditch, well, hey, it may be inevitable. Well – I mean, isn't that an appropriate – I think there's two – at least two answers to that question, Your Honor. First would be Termini again, which says when you're making the decision of whether a danger is probable rather than merely possible, you have to take into consideration human error, mechanical failure. You can't just say, well, if he does it right, then there's not going to be a problem. And, of course, the negligence of the plaintiff in this case can certainly be contributory negligence. But the question is, regardless of what this plaintiff did here, should – before this accident ever happened, should the BLM have seen – have foreseen that this was a dangerous condition? As far as the mark on the track goes, Your Honor, the mark on the diagram, there's absolutely no substantial evidence to support any conclusion. The mark on the diagram is unsupported by the testimony that was given concerning the diagram, and it's unsupported by the diagram itself, the conditions under which it was made, the foundation – there was no foundation laid for the diagram. The diagram is inconsistent with other objective evidence, such as the photos showing a curve. The diagram shows a straight road, not a curved road. The diagram shows the court widening, if anything, at this spot. All the testimony in the photos show the road narrowing. You have this diagram made at night in 30 minutes after the ambulance had come and gone and parked right over where this line on the diagram is supposed to be. As I gather from the photos, the road was what, roughly – and the other information supports – normally would have been around 20 feet wide? Correct, Your Honor. And virtually the entire – most of the entire right lane got eroded out, and it was what, an 8-foot across? Exactly. So when he comes up and over, the first thing at night, he starts to go down. He unexpectedly hits this eroded area that defendants like to call the shoulder, and then – again, in the pictures, you'll see in exhibits – well, when you get to Exhibit 5 of 29, you'll see how actually close to the – even the travel portion, the ditch is. So how much roadway was – about 12 feet left over, then, of navigable? Yes. Yes, of what you might call the travel portion, the smooth. So this essentially pinched the road at that point, down from 20 to 12, and then back to 20? Exactly. And it pinched it right in the lane that he was driving in, which is one of the reasons it is – the peril was hidden. He didn't expect that as he came around. Is this a round-trip road? That is, you go in, but that's the only – also the only way out? Well, it's – yes. As I understand it, it's not only the main entrance, but to the CCMA, it's the single artery which connects people on both sides. But, Your Honor, to put it on the head of a pin – You're a little too close to the mic. Thank you, Your Honor. How about this? To put it on the head of a pin, the diagram was drawn under terrible conditions. There was no foundation laid by any witness, including Officer Traynor, for the diagram. It's inconsistent with other objective evidence, and if you look at the testimony itself, Pierce didn't testify. Deggers said, well, I'm basing everything I say on the diagram and on the track marks in the photos, but there is no track mark in the photo. And Schwartz, when he was asked to look at Exhibit 4 or whatever, said, no, there's track marks here, Mr. Schwartz. And he went out that night, and the next day he said, can you tell whose track marks these are? And he said no. So Deggers' testimony is worthless as far as supporting the line, and Officer Traynor, who you would think, because he was Pierce's partner and he's a CHP officer and he testified about the diagram, he didn't help measure the path. He didn't help Pierce with the measurements. There's no evidence that he talked to Pierce. He didn't go back the next day. He knew nothing about the cone. So if you look at RT between 116 and 120, you'll see that Traynor's testimony about the diagram is pure speculation. So neither the diagram nor the testimony concerning it can constitute substantial evidence to support the Court's finding. That might be a good idea, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Claire Cormier. I'm an assistant United States attorney representing the United States of America in this case. I wanted to respond to a few things that counsel mentioned or that the Court raised. With regard to the road, I don't have a particular site to tell you, but I believe it's described as a single-lane dirt road. While one could perhaps view that somebody might stay a little more to the right than the left, it is described as a single-lane dirt road that people do come both directions on. So how much of that single lane was gone? The lane was not gone. Part of the shoulder was gone. So how much of the, whatever we call it, it was 20 feet wide at one point? Well, it's 20 feet wide at a point measured not exactly at the point where the erosion was, according to the CHP diagram, which is Exhibit 1. Unfortunately, the officer did not measure right at the point of the eroded area. So how much into what available footage for a single-lane road was taken out by the ditch or the erosion? Again, there's different testimony on this. There's testimony that it was the shoulder, not the traveled portion of the roadway. And if you look at the photographs, you see a lot of vegetation right near the edge, right near the area of the erosion, such as in Exhibits 4, 5, and 29, which also show the red cone, which is the end of that 20-foot reel mark. If you look at those photographs, one can certainly understand the testimony of Ranger Schwartz and others that this was part of the shoulder of the road and not the really traveled portion of the road. Would you disagree with the fact that at this point the road narrowed from 20 feet to just 12 feet? I don't know the precise dimensions. I would agree that if you look at the road to be the traveled roadway and the shoulder, then, yes, the road did narrow to some extent. We don't have the exact amount. It may be something in that. Was there testimony to that effect? There may have been, Your Honor. I don't recall for certain. But it's something in that range in any event. Judge Reimer asked about what the effect of the track marks are. And, again, I would refer the Court to Exhibits 4, 5, and 29, which show the red cone. Officer Treiner discussed in his testimony that it was commonplace for officers to work together in investigating an accident. There's nothing unusual about the fact that one officer did the measurements and the drawing, and another officer. I mean, apart from that, and apart from the detail or the substantiation for it, I mean, I guess my question was, do the track marks have anything to do with the real question, which is whether the reason it was probable that there would be an accident here. I mean, obviously, the track marks would be germane if there's a reversal here and the trial goes forward. And, again, I would refer the Court to Exhibits 4, 5, and 29. Those are in Excerpts of Record, page 64, 65, and 72. And if you look at those, you can see that if you compare that to Exhibit 1, the diagram, which is page 61 of the Excerpts of Record, that if somebody is coming around that curb, as is most apparent in Exhibit 29 on page 72 of the Excerpts of Record, and their right tire gets to the point where that red cone is, they're headed off the road whether or not the ditch is there or not. And that's what Officer Treiner testified to. That's what Mr. Degger testified to. Kennedy. Did the Mr. or the master judge rely on Officer Treiner in his decision? He discussed the trajectory issue in his decision, and that was supported by Officer Treiner's testimony and Mr. Degger's testimony. Excuse me. The magistrate judge discussed the conflicting evidence regarding the precise location of the washout, whether it was on the traveled roadway or the shoulder. He noted the evidence that Mr. Neva was traveling at an excessive speed and had been drinking. He noted that there had been no prior accidents. He noted that the BLM had not violated any of its own safety standards with regard to this road. When you say he, who are you referring to? I'm referring to Magistrate Judge Seaborg. He referred to all of these items in his findings of fact and conclusions of law, and when you look at that evidence put together, it certainly is sufficient for one to conclude that the BLM did not know or should have known that a accident or the injury was probable as opposed to possible. And the wheel track is relevant to that because if he would have been heading off the road regardless of whether the erosion was there, then even this accident doesn't go to show that an accident was probable versus possible, because this accident could have happened regardless of whether the erosion was there. He might have rolled down the ravine in a slightly different fashion because once he was heading off the road and hit the eroded area, the car, I think, behaved differently than it would have if it had just gone straight into the trees down the ravine. But the accident itself would have happened regardless, and that's because of what Mr. Niebuhr was doing that night. Sotomayor, following up on the original place that I started, and that is with respect to the hiddenness of the peril, the magistrate judge said there was insufficient evidence of it, but in his discussion of that point did not come to grips with the expert's testimony, although, of course, he acknowledged it in the earlier part of his opinion. So why is why, in your judgment, wasn't there clear error? Because of the court can look at the totality of the evidence before the district court to determine whether there is sufficient evidence there to support the decision. And here, I've mentioned several things that the district court did specifically mention that they were – that it was considering in its decision here. I don't believe that the district court needed to make specific factual findings as to each element. For example, a very precise finding regarding the hidden peril or a very precise finding regarding whether or not the eroded area was on the shoulder versus the traveled portion of the roadway. Kagan. Let me put my question a little bit differently. I agree with that in general, but here the district – the magistrate judge found that there was insufficient evidence to show hidden peril, that the peril was hidden. Why isn't that finding clearly erroneous, given the expert's testimony, that it couldn't be seen no matter what? Well, it could be seen if somebody had been driving at a slower rate of speed. It could be seen more easily during the day. It was not in the traveled portion of the roadway, and therefore, again, that goes to how much of a peril it is. So I don't see that there is a clear error in that particular finding by the court, but even if there were, that particular issue, you again can look at the totality of the circumstances. Again, one of the issues that was raised by the court was the lack of prior accidents. And again, I agree with you that there's no case that says a court can't consider that. Judge Hugg asked about how many people traveled that road, and it was either Mr. Buehler or Mr. Slibseger, and I certainly may be pronouncing those names wrong since I was not the trial attorney, who testified about the 50,000 person hours or something like that, that people that come into the Clear Creek management area per year. And I believe it was either Mr. Buehler or Mr. Slibseger who, when you divide that by number of cars and things, came out with about 20,000 people entering this area a year. Now, not all of those are going to travel this precise portion of the road, but I think one could easily assume that thousands of people are traveling it. Mr. Neva traveled it. Kennedy. How many after the wash took place? We don't know exactly how many traveled that particular area, because the timing of when the wash occurred. I wasn't all year. The wash had been there for several years, according to the testimony of Ranger Schwartz. He had mentioned to the Nevas, to Mr. Neva, Mr. Gary Neva, and Lisa Neva, that this had been something he had been aware of for several years. And he had been he had expressed concern about it because of environmental issues. There's free, there's naturally occurring asbestos in the area, and so there's water and soil and things wash. So given that this has been there for several years, thousands of people travel in this area every year. The plaintiff, the appellant, traveled in this area, not necessarily on this particular piece of road, but maybe he did. He was going there this night several times a year. Mr. Murphy traveled there several times a year. He was Mr. Neva's traveling companion the evening of the accident. This indicates that a lot of people can get past this area, not just Ranger Schwartz, who knows the road so well, but a lot of people can get past this area without having any problem with an eroded area off of the side of the shoulder, if they're driving in a responsible manner. Now, yes, it was night, and that does impair one's ability to see over hills and around cliffs and that sort of thing. And that should have counseled Mr. Neva to drive even more slowly, particularly when his traveling companion is begging him to do so. Now, of course, that has to do with the ultimate issue of negligence and so forth, not the question that we're concerned with. But it does go as to whether an accident is probable. People can assume that people will act responsibly. Now, yes, when you're designing a road, you should take into account that some people may have slight miscalculations or their reactions may not be as quick as other people. But you don't, shouldn't have to assume that you have to allow for somebody driving at an excessive rate of speed to the point where his traveling companion is begging him to slow down after drinking a pint of vodka. That's not what a reasonable person should have to consider in designing a road and thus what they should be considering in whether an accident on that road is probable. Now, if the Court agrees with the district court on the recreational use immunity issue, then there's no need for it to deal with the other issues raised in our brief, which is the duty issue and the discretionary function issue. As the Court did in the Matisse case, it can simply say that it doesn't need to resolve those issues because of the recreational use immunity issue. However, if for any reason the Court finds that there was clear error by a magistrate judge on the recreational use immunity issue, then the Court still can affirm, based on the lack of duty of the BLM here or the discretionary function exception. With regard to the duty issue, the district court incorrectly found that the BLM had a duty to maintain this road. This was a county road. The county retained its easement on this road, even though the county had gone through the statutory process, which the California legislature has allowed, to disclaim its maintenance responsibilities. So the county didn't have to maintain it as long as they posted the signs, which they did, warning the public that you've now reached the end of the maintained road, which, again, should counsel against the behavior of Mr. Neva on the night in question. So here, yes. Kennedy, who did, in fact, maintain it?  After that time, given that the county had disclaimed its responsibility and the BLM, by national policy in the BLM manual, was barred from spending its own funds on maintenance of non-BLM roads, the BLM entered into various agreements where, when they could get money from an outside source, sometimes with the county's assistance, such as the off-highway vehicle funds from the State of California or FEMA funds after the El Nino events, when they could get those funds, they would almost act as a contractor for the county. In fact, I think there were invoices that they would give to the county in some instances to do the maintenance. But that did not mean that they had undertaken a general responsibility for it. They were doing the work when they could get the funding from an outside source. They had not – they did not undertake a general responsibility. The question is, did they do the maintenance and then submit a bill?  The question is, did they get the funding from the outside source, was confirmed before maintaining or did they maintain and then submit a bill? There were both. Both things happened. However, Mr. Buehler testified that they – he did not authorize any work to be done whereas BLM desires to assume the maintenance responsibilities in this area. Well, that certainly may have been what they desired to do within the confines of that memorandum of understanding. The memorandum of understanding related to those specific OHV funds that the county had available to it at that time that had expired, but there was an understanding that it could be extended. And so BLM was going to assume those maintenance responsibilities through that grant program. It was not assuming general – a general duty to keep up this road forever. I think the district court was somewhat uncomfortable with the idea that there could be a road out there that the public is allowed to go on that no one has responsibility for maintaining. But that is precisely what the California legislature has allowed. Had this been a county road on county land and the county had gone through the process it did to disclaim its maintenance responsibilities, I think there would be no question but that the county would still not be liable, even though no one would have any responsibility for maintenance of the road. Here, the fact that the underlying land is BLM land shouldn't change that calculus unless the BLM had assumed a general responsibility, which they did not. I'd also like to talk briefly about the discretionary function exception. As I mentioned, the BLM manual, which is at Supplemental Excerpts of Record 99, specifically states that the BLM is not to spend its funds to maintain non-BLM roads. That was the policy decision made on a nationwide basis that the local people had to work within. And the Dallaheit case says that when a decision is made, the lower level people implementing it are also protected if that original decision is a protected discretionary decision. Now, this is a very different situation from the mold in the commissary in the Wisnant case. In that case, there was no decision made not to keep up the cleanliness of the commissary. It was simply sort of let go. Here, there was a decision made not to spend BLM funds on this case. I mean, on non-BLM roads. This case is also not like the ARA leisure decision, where this Court stated that there was, quote, no clear link between the Park Service road policies and the condition of the road in that case. Here, there is a very clear link between the BLM policy made on a nationwide basis and then implemented by the local people and the condition of the road. BLM was prevented from spending their money because of the nationwide decision made on how the BLM would use, would carry out its mission. And if, so here, the decision by the district court as to the recreational use community should be dispositive and the Court doesn't need to get into the other two issues of duty versus discretionary function. However, those are also well supported in the record and would be additional grounds for affirming the judgment in this case. And unless the Court has further questions, I'll submit. All right. Thank you, counsel. Mr. Bergerson. I have four quick points that I'd like to make quickly. I'd better make them quickly. The first is that to respond to Your Honor's questions, it was 20 feet. It did narrow to about 10. And then it became the eroded area. I'm sorry? I thought it was 12. About 12, Your Honor. Yes, yes. And the sites for that are generally at our brief, at opening brief at pages 34 to 35. The Schwartz testimony as to what the Nevis said at 148 and 149 and 598, which is in the excerpts of record. Degger's testimony at 674 and 675. Traynor's testimony at 119 and 122. That supports that. Secondly, this use of the word shoulder all the time as if something on the shoulder makes it less of a hidden danger just makes no sense at all under these circumstances where the shoulder, so-called, is just the eroded area of the road, which makes things more dangerous and which comes up very quickly. Thirdly. Except you're not supposed to drive with a shoulder, are you? Well, if you come up and over the hill, Your Honor, and you expect to find traveled road and all of a sudden you find eroded road, no, you're not supposed to. But it certainly makes for a dangerous condition nonetheless. And as far as they have no ability to maintain these roads with non-BLM funds, the site at SCR 99 is interesting. It says you can't spend funds on non-BLM owned or controlled roads. And if there's one thing clear from this record is BLM controlled this road. And for that very reason, under the Alkaraz case and under 324A of the restatement, regardless of what the document said, they had a duty under California law to maintain it. So the fact that it keeps saying non-BLM funds, but, and finally, the final point in 11 seconds is. You're out of time, so just wrap it up, please. Okay. Is that there's talk about Schwartz being worried about environmental concerns, but the court believed what the Nevis said, that Schwartz told them that two to four months before the accident, he had told his superiors of the danger because he said it looks like liability there. And right afterwards, the BLM filled it in. So that's the record. Thank you, Your Honors. Okay. Thank you, Wilson. The matter just argued will be submitted.
judges: Hug, Rymer, Fisher